### SAGENDORPH v. AMERICAN METAL STAMPING CO.

(District Court, E. D. Pennsylvania. November 30, 1915.)

#### No. 1139.

CORPORATIONS ⬅565—INSOLVENCY PROCEEDINGS—PROVABLE CLAIMS.

Creditors of a defunct corporation, whose property and assets had been informally taken over by a new corporation having to a large extent the same stockholders, by entering into an agreement by which they accepted stock of the new company for the amount of their debts, thereby by ratification waived the right to avoid the transfer of the property of the old corporation as fraudulent, and also the right to claim that the new company had assumed their debts, and cannot prove as creditors in insolvency proceedings against the new company.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2281, 2282; Dec. Dig. ⬅565.]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by George A. Sagendorph against the American Metal Stamping Company. On exceptions to report of special master. Report confirmed.

Winfield W. Crawford and Samuel W. Pennypacker, both of Philadelphia, Pa., for exceptants.

Middleton & Blakely, of Philadelphia, Pa., opposed.

DICKINSON, District Judge. The obscured view which we now have of the facts of this case and the difficulty of grasping the significance of some of them is due to the mix-up which always results when facts, in the sense of things done, are things which were done in one situation of the parties, and their significance is attempted to be found under circumstances presenting an entirely different situation. The corporations, with the affairs of one of which we are now concerned, were not only what are commonly called "close corporations," but one was wholly and each was mainly a "family corporation." Certain members of what are designated in this record as the Sagendorph and Codman families, respectively, conceived the thought of a business enterprise. This they put in execution through the instrumentality of a nominal corporation. We say nominal, because little effort seems to have been made to keep clear the distinction between the individual rights of the members of the corporation and the rights of the corporation itself, and none at all to distinguish such rights as the members of corporation might have as stockholders and such as might flow to them as creditors or otherwise. Why these distinctions were ignored is evident. The promoters of the enterprise concerned themselves only with the profits which were to come to them. They did not have in contemplation the possibility even of the insolvency conditions with which we are confronted. It is worth the effort to attempt to get the life history of these corporations into our minds, because, if we have a clear statement of the facts, the questions which have been raised answer themselves. Some of these facts have been left to conjecture, or at least to inference.

Letters patent issued in 1902 to a corporation by the name of American Metal Stamping Company. This was a Delaware corporation. It had a nominal capital of $250,000. What, if anything, was received by the corporation in consideration of the issue of this stock, or how much was issued, we do not know. There is the probability that it received something, because the nominal value of its assets exceeded the sum which the evidence discloses came to it from other sources. We do know that it received moneys other than its business receipts. Some of this was received from individuals who were among its stockholders. Some of it was received from financial institutions which had discounted notes, or loaned on notes or other obligations and placed the proceeds to the credit of the corporation. Of some of these notes the corporation was the maker. Of some of it was the payee. Of others it was the indorsee. Some of them bear the indorsement of individual members of either the Sagendorph or the Codman families. Some of them, perhaps all of them, were accompanied by the deposit of collateral which was the individual property of some of

those interested in the company. We have no evidence of the total amount thus received by the corporation, and no direct evidence of what the transactions really were. All we have is the acknowledgment of the parties interested (made long subsequent to the time of the transactions) that $15,000 had been received under circumstances out of which a debt arose to John E. Codman of $7,500 and a like sum to L. Lewis Sagendorph. From a like acknowledgment, we are justified in the inference that the nominal value of the assets of the corporation was $32,600. This corporation had a more or less precarious existence, which so far as its business activities are concerned terminated in 1905, and (it is agreed) its legal existence ended in 1907 by what is called the forfeiture of its charter for nonpayment of taxes.

In 1905 letters patent were taken out in Pennsylvania for the charter of another corporation by the name of Enameled Art Metal Company. This had a nominal capital of $75,000. How many shares of stock had issued before June 7, 1911, and what, if anything, had been received by the corporation for the stock which was outstanding, we do not know. It might be inferred the 10 per cent. required by law was received, and as three persons not shown to be identified with either the Sagendorph or Codman families, either originally or eventually, became stockholders, it might further be inferred they paid for their stock, either as subscribers or purchasers, and we have in the agreements of 1911 the admission of the parties showing stock to have been issued for value or without it.

It is admitted by the parties, and therefore found by the master to be the fact, that the Pennsylvania corporation took over the holdings of the Delaware company and succeeded to its business without any formal transfer, and without other act of transfer than is implied in what was done. Even the act of doing this was as clouded as were all the things done. Although it is admitted that the Pennsylvania corporation carried on the business formerly conducted by the Delaware corporation, it was done, not under the name of the Pennsylvania company, but under the old name, which was the name of the Delaware corporation. The theory is advanced by all parties in interest, and because of this accepted by the master, that after 1905 the business was in fact carried on by the Enameled Art Metal Company, doing business under the trade-name of American Metal Stamping Company. What actually was done would appear to be this: The promoters of this business enterprise were given, through the laws of Delaware, a baptismal name. This was by the creation of a new person in the form of a corporation. The parties concerned, however, went ahead without any regard to the existence of this artificial person, other than to use its name. Things were done as if they had formed a partnership under that name. Later on they secured another baptismal name from the state of Pennsylvania. They continued, however, just as before, without even making use of the new name. The practical reason doubtless was to preserve whatever value the old name had as a trade-name.

This brings us, after a lengthened prelude, to June 7, 1911, when something of a change took place. The occasion for the change ap-

parently was this: The relations of the corporations with those who as individuals were concerned with the corporations had become interminably confused. The managers were borrowing money in the name of the corporation. A statement of its financial condition could not be made. Counsel was consulted, and he did the best he could (perhaps, under the conditions, the best which could be done) to bring order out of chaos.

Let us pause here to get a view of the rights of the parties in the light of the facts which they now agree to have existed. The Delaware corporation, when in existence, had assets nominally worth $32,-600. It owed money to Sagendorph and also to Codman. In addition to this, each had contingent claims, dependent upon the fact of whether he was called upon to pay as indorser or his property would be taken to pay debts owing by the company to certain banks. It is too clear to call for more than its formal statement that the corporation could not give away its assets to the prejudice of its creditors, nor could it wipe out its indebtedness by the simple method of ignoring its debts. It might have made (with the consent of all concerned) a bona fide sale of its assets, receiving the consideration either in cash, or in an assumption of its debts, or in the stock of another corporation, and have distributed this consideration to its creditors and stockholders.

On June 7, 1911, the situation was this: In a very practical sense the only creditors were Sagendorph and Codman. The debtor was defunct. The property which the debtor once had was in the possession of another corporation. The directors of the defunct corporation and of the new and all the stockholders and creditors of the old were met together to decide what should be done. One method of dealing with the situation would have been to have had the new corporation assume the debts of the old and to have issued stock of the new to the stockholders of the old, to the value of the assets of the old in excess of its debts. It was thought to be impracticable to do this. One obstacle in the way was that the assumption of the debt would have destroyed the credit of the new corporation. Another was the consent of the three stockholders of the new company who were not stockholders in the old would need to be secured, and they were not present. There remained, therefore, as the only thing to be done, the issuing of stock in the new company to both creditors and stockholders of the old, to the full value of the assets received, in proportion to their respective interests.

The fact cannot be doubted that this was what counsel advised could be done, and, anticipating it would be acceptable to all, he prepared papers expressive of this agreement. This was in fact what was actually done, although the curious preference which some people have to pretend, or at least go through the form of deceiving themselves into believing, they are doing something different from what they are doing, prompted the suggestion that the agreements take the form which they have taken. If the arrangement had taken the form suggested, and the company had been prosperous, the stock dividends received could have been applied by the owners of the stock to the payment of the indebtedness. In the same event the agreement as

made would have the same result. The only real purpose which could be served by the agreement as made, which would not have been served by the agreement as suggested, is that in tying the stock together the application of all dividends to the payment of the indebtedness was assured. Whether this was only a formal or was a real difference depends upon whether the debt obligations and the stock holdings were held in like proportions. Whatever the reason, or whatever the effect of making a departure from the suggested method of accepting stock for the debt, the agreements were made. The only changes made were these:

(1) Instead of issuing stock in the new company direct to the creditors and stockholders of the old, it was issued to a trustee for them.

(2) Instead of paying dividends to the stockholders, and they applying the money to the payment of the indebtedness, it was agreed that the company should so apply the dividends. Really what appears to have been done in fact, or at least in form, was to make the dividend check (so far as dividends were paid) payable to the stockholder, and it was by him indorsed over to a bank which held the note or property of Sagendorph or Codman pledged for its payment.

In all other respects the agreement as made followed the suggested agreement.

The report of the master vindicates the conclusions reached by him that the parties to the agreement are bound by it, and that neither John E. Codman nor L. L. Sagendorph can be awarded dividends as creditors of the Pennsylvania corporation whose assets are now being distributed. There is no evidence of fraud or overreaching in securing the agreement and a consideration is not only imputed by the seals, but in fact existed.

The earnestly urged and clear-cut propositions laid down by counsel in support of the claim of John E. Codman call for specific comment. We treat them as requests for findings, and follow the alphabetical enumeration adopted by counsel.

(a) The four years referred to during which the business of the new corporation was done in the name of the old we assume to have been before 1911. It could be found to have been fraudulent only against some one prejudiced thereby. Obviously it did not deceive, and could not have affected, John E. Codman.

(b) Whether the taking by the new corporation of possession of the assets of the old was fraudulent under the statute of Elizabeth, or whether thereby the new corporation became trustee for the old, are questions beside the mark, for the reason that the only persons who could complain accepted a new arrangement for the payment of the debts due them and confirmed what had previously been done.

(c) Whatever the attitude of mind toward the agreements of June 7, 1911, with which their consideration is approached, they can be construed in no other way than as meaning that the debts of the old company were to be met, not by the new as a debt, but out of dividends on the stock of the new issued to the creditors and stockholders of the old, in payment or substitution for the assets of the old, which the new had received.

Nor do we think the master can be convicted of error in holding that the basis of the claim now made was in part to be looked for in the 1911 agreements. The debt claimed was originally the debt of the old corporation, and any injury to the creditors came to them through an injury to their debtor. The tort committed, if any was committed, by the new company, was primarily against the old company. The creditor could directly assert a claim against the new company only by assuming one or more of these positions:

(1) That payment of the debt due him had been assumed by the new company.

(2) That the creditor was attacking a transfer by his debtor which was fraudulent and void as against the creditor.

(3) That the creditor had been doubly wronged: First, by a wrong done to the corporation which was his debtor; and, secondly, by a wrongful failure to have the first wrong redressed, whereby the rights of the creditor had been prejudiced.

The agreements of 1911 meet every of these positions. There is in them the agreed fact that the new corporation had not assumed the debt. There is in them a waiver of the right of creditors to avoid the transfer by consenting to and ratifying and confirming it. There is, so far as the creditors and stockholders of the old company are concerned, a sale of whatever interests they had in the assets of the old company. Above all, there is the making of an agreement through and by which the debts due are to be paid and wiped out through the acceptance by the creditors of something else in place of whatever claims of debt or otherwise they had before held. After this the creditors clearly had no claim against the new corporation, whatever they had before.

What has been said as to the Codman claim disposes of the Sagendorph claim. The position taken in the assertion of the latter is this: The ruling of the master in rejecting both claims is acquiesced in as right and proper. If, however, one is to be allowed, both should, as they have an equal footing.

All the exceptions to the master's report are dismissed, and the report confirmed, and counsel may submit whatever further decree should be made to carry these findings into effect.

It should be added, as explanatory of the fact that we are now dealing with the affairs of the American Metal Stamping Company, that the name of the Enameled Art Metal Company was changed to American Metal Stamping Company.